# In the District Court of the United States
## For The District of South Carolina
### BEAUFORT DIVISION

Jerome Will James, #288382,     )     Civil Action No. 9:05-2733-DCN-GCK
)
             Plaintiff,    )
)
     vs.          )    __REPORT AND RECOMMENDATION__
)    __OF THE MAGISTRATE JUDGE__
Willie Davis, Lt.; and     )
Robin Chavis, A.W.,     )
)
            Defendants.   )
_____)

## I. INTRODUCTION

The Plaintiff, Jerome Will James ("Plaintiff" or "James"), is a state prisoner who was incarcerated in the Evans Correctional Institution ("ECI") of the South Carolina Department of Corrections ("SCDC") at the time of the alleged events giving rise to this action.[1] Proceeding *pro se*, he seeks relief from the above-captioned defendants, Willie Davis, Lt. ("Lt. Davis") and Robin Chavis, Associate Warden of ECI ("Associate Warden Chavis"). Lt. Davis and Associate Warden Chavis will be referred to collectively as the "Defendants".

Plaintiff alleges that the two Defendants subjected him to cruel and unusual punishment in violation of his constitutional rights by incarcerating him in the Special Management Unit ("SMU") for approximately five (5) months without a mattress, sheets or a blanket, and without his personal property, in order to punish him for his attempted escape from ECI and his assault of a corrections officer.[2] Plaintiff has filed suit against the

---

[1]    Plaintiff presently is incarcerated at Lee Correctional Institution. [21-1]

[2]    On October 11, 2004, Plaintiff was charged with, and later convicted of, the disciplinary offenses of Class I escape, assault and battery of an employee, hostage taking, and possession of a weapon. *See* Defendants' Answer [7-1] at p. 2, ¶ 12.

Defendants in their individual capacities,[3] and seeks an unspecified amount of compensatory and punitive damages.  [1-1]

Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(d), D.S.C., the undersigned United States Magistrate Judge is authorized to review all pretrial matters in prisoner cases filed under 42 U.S.C. § 1983, and submit findings and recommendations to the District Court.

## II.  *PRO SE* COMPLAINT

Plaintiff is a *pro se* litigant, and thus his pleadings are accorded liberal construction. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curiam*); *Estelle v. Gamble*, 429 U.S. 97 (1976); *Haines v. Kerner*, 404 U.S. 519 (1972); *Loe v. Armistead*, 582 F. 2d 1291 (4th Cir. 1978); *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir.), *cert. denied, Leeke v. Gordon*, 439 U.S. 970 (1978).  Under established local procedure in this judicial district, a careful review has been made of the *pro se* Petition herein pursuant to the procedural provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, Title I, § 104, 110 Stat. 1214. This review has been conducted in light of the following precedents:  *Denton v. Hernandez*, 504 U.S. 25 (1992); *Neitzke v. Williams*, 490 U.S. 319, 324-25 (1989); *Haines v. Kerner*, 404 U.S. 519 (1972); *Nasim v. Warden, Maryland House of Correction*, 64 F.3d 951 (4th Cir. 1995) (*en banc*), *cert. denied*, 516 U.S. 1177 (1996); *Todd v. Baskerville*, 712 F.2d 70 (4th Cir. 1983).

*Pro se* pleadings are held to a less stringent standard than those drafted by attorneys. *Hughes*, 449 U.S. 5 (1980).  Even under this less stringent standard, however, the *pro se* complaint nonetheless may be subject to summary dismissal.  The mandated liberal

---

[3]    Plaintiff stated in his reply to Defendants' Answer that he was suing Defendants in their individual capacities, and "I only put down their official capacity because the complaint asked for it.  I want to clear that up, because I'm suing defendants in their individual capacity."  *See* Plaintiff's Motion to Reply to Answer [9-1] at p. 4.

construction afforded to *pro se* pleadings means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so, but a district court may not rewrite a petition to include claims that were never presented. *Barnett v. Hargett*, 174 F.3d 1128 (10th Cir. 1999). Likewise, a court may not construct the plaintiff's legal arguments for him (*Small v. Endicott*, 998 F.2d 411 (7th Cir. 1993)) or "conjure up questions never squarely presented" to the court. *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985), *cert. denied*, 475 U.S. 1088 (1986). The requirement of liberal construction, however, does not mean that the court can ignore a clear failure in the pleading to allege facts which set forth a claim currently cognizable in a federal district court. *Weller v. Dep't of Social Services*, 901 F.2d 387 (4th Cir. 1990).

## III. FACTUAL BACKGROUND

Plaintiff filed this action against the Defendants a result of his placement in ECI's SMU on October 11, 2004 as a result of an attempted escape with two other inmates, and the assault of an ECI officer. Plaintiff alleged he first was placed in a 4 foot by 4 foot holding cell with Johnny McCoy, another inmate who was involved in the escape attempt, for six or eight hours without the opportunity to use the toilet. The subsequent events, as described in Plaintiff's Complaint, are as follows:

> When they did place us on the wing in a regular cell, it was a stripped out one. (Cell 124 and 135). I was then told by an inmate that was already in SMU that they were going to keep us that way for 72 hours, so I asked the Officer about my property, and he said we weren't allowed to have anything. So, therefore I stayed in that cell for 72 hours with only my jum[p]suit, then I talked to several officer and sargents about me not having my property or a

mattress.[4]  They then told me that I would have to write a request to Lt. Davis.  I then wrote a request to Lt. Willie Davis, which I never received a response to.[5]

On Oct. 16th 2004 I was placed in cell 128 where inmate Washington was at, then I discovered that n[e]ither did inmate Washington have his property or a mattress.  We then wrote request[s] to Lt. Davis and the commissary officer Ms. Belcher, which we never received a response to.  Then we was able to speak with Lt. Davis face to face and when we asked him about our property and a mattress he stated, "Y'all ain't getting nothing somebody stole y'all property and mattress and A.W. Chavis told [me] not to give y'all nothing."  I then told [him] that they was suppose to give us sheets, blankets, and mattresses, he then stated, "Chavis to[ld] me not to give y'all anything and if y'all want a mattress y'all going to have to pay for one."  He then walked away from the door.

Time passed I don't know how much, because fighting the cold air along with the steel bed frame I lost track of time.  When he did returned he had a paper for us to sign to agree for them to de[bi]t our account.  I told him I wasn't paying for a mattress something I'm suppose to have according to the policy, and that I wasn't responsible for it because my cell should have been locked, he then stated, "You don't have to, you wont get anything from me you think you can assault my officers and get away with it."  He then let inmate Washington sign it and then walked away.

More time passed, now we've been moved to the other side and I was placed in cell 119 and still I wasn't given a mattress.  I kept writing request and talking to the sargents, but nobody ever responded to the request and the sargents kept saying they couldn't do anything about it I had to take that up with Lt. Davis.  I then wrote a request to A.W. McFadden (see exhibit -A) about some property an inmate had of mine, and I also informed him about me not having anything.[6]  I was then moved back to the other side, and when I did get a response it was signed by A.W. Chavis stating that she would forward it to A.W. McFadden.  I then realized that she was behind me not getting any mattress and stuff, and that she was using that to punish me for what I was on lock up for and her and Lt. Davis was working together to bring about unwanted pain to me.

---

[4]    Plaintiff states in a subsequent pleading that he was in Cell 134 of SMU wearing only a T-shirt, boxers, a jumpsuit, and a coat.  His shoes and socks were taken by the officers, and he was without other clothing or any mattress or bedding.  *See* Plaintiff's Affidavit at ¶ 5, attached to Plaintiff's Brief. [21-1]

[5]    Plaintiff states that he wrote several requests to Lt. Davis, and also spoke "face to face" with him about obtaining his property and his bedding.  *See* Plaintiff's Affidavit at ¶¶ 5-6, attached to [21-1].

[6]    Plaintiff's Exhibit A, dated November 14, 2004, is a Request to Staff Member addressed to Associate Warden McFadden which stated that Plaintiff "wrote Ms. Belcher a request over 30 days ago" requesting socks and boxer shorts, and his personal and legal papers."  Apparently, this Request was reviewed by Associate Warden Chavis, who informed Plaintiff on November 21, 2004 that she was forwarding his Request to Associate Warden McFadden.  *See* Exhibit A, attached to Plaintiff's Motion to Appoint Counsel.  [3-1]

As months went by I was then told to file a grievance about my property and mattress. I the[n] filed grievances about my property and mattress (see exhibit B & C) on March 1st, 2005. I was then given a mattress on Mar. 7th 2005. The grievances was returned unprocessed.[7] After this I realized the violations of my constitution[al] rights, so I then got the officer that gave me the mattress to write a statement.[8] (See exhibit -D) I then filed another grievance on the violations of my Amendments, then I was moved to another institution and the grievance was returned unprocessed.[9] (See exhibit -E) They said that they couldn't process it because the action I

---

[7]    Plaintiff's Exhibit B is a Step 1 Inmate Grievance Form dated March 1, 2005 which stated that when Plaintiff was taken to court on February 10, 2005, his property was packed in a green bag and left in the possession of Lt. Davis, who "stated that he was going to throw my stuff away. I've wrote request forms to him and talked to him face to face and he still haven't return my property. In my bag was my sheets, soap, toothpaste, toothbrush, personal mail, and legal mail." Plaintiff asked that his property be returned. On March 17, 2005, Plaintiff's grievance was returned unprocessed because Plaintiff "did not attempt an informal resolution, which should have been a Request to Staff to Lt. Davis. However, Lt. Davis informed me that on 3/16/05 you were allowed entry into your bag/property. Therefore, your action requested has been accomplished." *See* Exhibit B, attached to Plaintiff's Motion to Appoint Counsel. [3-1]

    Plaintiff's Exhibit C is a Step 1 Inmate Grievance Form dated March 1, 2005 which stated: "I came to lock up on 10-11-04, and they didn't give me a mattress. And I still don't have no mattress. I wrote request forms and didn't get any response from them." Plaintiff asked that he be given a mattress. As with Plaintiff's other Step 1 Inmate Grievance, Plaintiff's grievance was returned unprocessed on March 17, 2005 because Plaintiff "did not attempt an informal resolution, which should have been a Request to Staff to Lt. Davis. However, Ofc. Stubbs confirmed to me on 3/17/05 you do have a mattress. Therefore, your action requested has been accomplished." *See* Exhibit C, attached to Plaintiff's Motion to Appoint Counsel. [3-1]

[8]    Ofc. Bernard Smith wrote a statement dated March 23, 2005 which stated that he had given Plaintiff a mattress "on or around March 7, 2005." *See* Exhibit D, attached to Plaintiff's Motion to Appoint Counsel. [3-1]

[9]    Plaintiff's Exhibit E is a Step 1 Inmate Grievance Form dated March 23, 2005 which states:

        On Oct. 11, 2004 I was brought to SMU. None of my property was given to me, so I filed several Request [sic] to the Lt. Which he never respond to any of them, so when I had a chance I spoke with him face to face. And he stated that Associate Warden R. Chavis told him not to give me [a] mattress or anything else, so he didn't. I wrote the warden about this and got a response which I've sent home, but there still wasn't any action taken. So therefore I went five months without a mattress and several without sheets and a blanket. So therefore Lt. Willie Davis and Associate Warden Robbin [sic] Chavis has violated my Eighth and Fourteenth Amendments of the U.S. Constitution." Plaintiff requested compensatory and punitive damages for the injuries he sustained from living in such conditions for those five months. Plaintiff explained that he had attempted informal resolution of the matter; three days after he was placed in SMU he wrote a request to Lt. Davis and had written several more after that date but he "never got any response. Then I spoke with Lt. Davis during the times he came around.

requested, they couldn't give it to me, so I filed this suit to get my action.  I also have a statement from the inmate that lived in the cell next to me.[10]  (See exhibit - F)  I've been having back pains and bad headaches while I was sleeping [sic] in that cell and after, and taking medication and going back and forward to medical, I didn't have any of these problems until I had to sleep on that cold steel.  Medical stated that the pain probably will never go away.  I'm now taken action by filing a lawsuit for the violations of my 8th and 14th Amendments, and I ask that I receive compensatory and punitive damages for the injuries that I sustained from the living conditions I was forced to live in for five months[.] [11]

According to Plaintiff, Lt. Davis stated:  "You . . . wont get anything from me you think you can assault my officers and get away with it[.]"  If true, this statement would lead one to conclude that Lt. Davis' refusal to give Plaintiff a mattress was simply to punish him for the assault.  Furthermore, if true, Lt. Davis' statement: "Chavis told me not to give y'all anything and if y'all want a mattress, y'all going to have to pay for one"[12] again leads one to conclude that Associate Warden Chavis had authorized Lt. Davis' actions.

As Plaintiff explained in a subsequent Brief:

[D]uring this time it was the time of the year when the weather starts turning cold, so we are having to ball up in balls on the steel to try to stay warm, because we don't have bedding, socks, or proper working heat.  When I spoke with Lt. Davis he had those papers for us to sign to agree to let them de[bi]t our account for a mattress, which we are suppose[d] to have by policy.  Which I refuse to sign, because if somebody stole our mattress we were not responsible for it, when I told him this he then stated, "you don't have to you want [to] get anything from me, you think you can assault my officers and get away with it."  He then let inmate Washington sign a paper and walked away.

I was then moved to the other side of SMU . . . and still I was stripped out.  I was without any warmth.  No heat was on at this time[.]  I had to use stuff to cover up the vent to stop the cold

---

I then wrote a request for the Warden dated on November 14, 2004."  This grievance was returned unprocessed on April 4, 2005 "because [Plaintiff's] action requested does not fall within the remedies within the extent of the SCDC Policy GA-.01.12, Inmate Grievance System."  *See* Exhibit E, attached to Plaintiff's Motion.  [3-1]

[10]    *See* Declaration of Randy Johnson, attached as Exhibit F to Plaintiff's Motion.  [3-1]

[11]    Plaintiff's clothing consisted of a t-shirt, boxer shorts, a prison jumpsuit, and a coat.  His shoes and socks were confiscated by ECI officials.  *See* Complaint [1-1] at p. 3 *and* Plaintiff's Affidavit at ¶ 4, attached to [21-1].

[12]    *See* Plaintiff's Affidavit at ¶ 6, attached to [21-1].

air from coming into my cell, while all this was going on Lt. Davis would come and make his rounds and he thought it was funny to see me in that condition, and he still fail to do anything about the situation.  So, I wrote A.W. McFadden [a Request to Staff member dated November 14, 2004][13] . . . . [Later], I received a response to my request form, which was signed by A.W. Chavis.  A.W. Chavis should have never gotten that request, because it wasn't address[ed] to her, it was addressed to A.W. McFadden, then A.W. Chavis stated on the request form that she was going to foward [sic] the request to McFadden . . . when she did do that that showed me that her and Lt. Davis was cospiring [sic] together, that's when I realized they wasn't going to give me anything.[14]

. . . I was informed by another inmate to file a grievance, so I did (see exhibit B & C) on March 1, 2005, I'm still living in a stripped out cell without proper working heat, and now the weather have gotten even colder.  I was then given a mattress on March 7th, 2005 and sheets and a blanket on Mar. 16th, 2005. . . .I then received the grievances back which was not processed, so I then filed another grievance (see Exhibit E) then I got a statement from another inmate (see Exhibit F)[.]  I was then moved to another Institution and my grievance was returned unprocessed.  . . . [15]

The whole time this was going on I was going back and forward to medical for my back and headaches I was having due to the fact of the condition I was forced to live in.  I see in my medical reports they try to make it look as the gunshot wound was the cause of my problems, it probably have something to do with it, but I didn't have these pains until I was forced to live in those conditions, which were unconstitutional.  The only reason I told them about the gunshot would is because they asked me if I had received an injury to my back."[16]

In support of his claims, Plaintiff has provided the court with the Declaration of Randy Johnson, another inmate, who had been housed in the SMU since January 1, 2005, and witnessed Officer Smith bringing Plaintiff "the inside of a mattress" on March 7, 2005. According to Johnson, Plaintiff did not have a mattress during the time between January 1 and March 7, 2005.[17]  Plaintiff also has submitted the an Affidavit from another inmate, Brandon Washington, who also had been housed in SMU on October 11, 2004, and who stated:

---

[13]    *See* Exhibit A, attached to Plaintiff's Motion. [3-1]

[14]    *See* Plaintiff's Affidavit at ¶ 9, attached to [21-1]

[15]    *See* Plaintiff's Affidavit at ¶ 9, attached to [21-1]

[16]    *See* Plaintiff's Opposition [21-1] at p. 5.

[17]    *See* Exhibit F, attached to Plaintiff's Motion.  [3-1]

I went without my mattress, sheets and blankets for at least 2 weeks after being placed on lock-up and [Plaintiff] was without blanket, sheets, and mattress much longer than myself.  Lt. Davis was a day shift supervisor and he told me and [Plaintiff] that inmates had taken our personal property and mattresses from the yard that morning [on October 11]. . . . . . We pleaded with officers for these items.  Lt. Davis finally went and investigated why we still don't have these things but when he returned he told us that Warden Chavis told him not to issue us anything.  He told us we were stripped out which was a term I was unfamiliar with but quickly understood.  At a later date Lt. Davis came to our cell telling us that the only way we get a mattress is if we pay for it.  I asked him how much it cost and he said $45.  My back and neck was so soar [sic] from layin [sic] on bare steel till I agreed and would have agreed to anything to get the mattress.  So I signed the form agreeing to pay for it.  [Plaintiff] on the other hand was explaining to the Lt. (Davis) that he couldnt [sic] afford the mattress and it was not fair that he be held responsible [for] the negligence of the wing officer.  He protested and him and Lt. Davis conversated for a period of time on this matter.  Lt. Davis was stern and told [Plaintiff] he cannot given him a mattress.  [Plaintiff] didn't agree to pay for the mat[t]ress and later when I received my mattress and we were moved to separate cells, he still was not givin [sic] a mattress for another period of time.  I don't know how long but I know he went at least three weeks without a mattress.  Throughout this whole period the temperature was cold at night time.  It seems to be customary for lock-up to have the A.C. on threw [sic] the winter so the fact some of us was stripped out, it remain[ed] at a cool setting.  This added to the discomfort experienced by me and [Plaintiff].  I should have documentation of when Lt. Davis propositioned us about purchaseing [sic] a mattress when I get it out [of] my bag.  This was at least 2 weeks after we had been already stripped out.[18]

Plaintiff contends that the Defendants "wanted to cause unwanted pain to me for the assaults that took place, so they did by forcing me to sleep on cold steel during the winter time for five months, there is no other explanation [sic] for their actions."[19]  The gravamen of Plaintiff's complaint is that Lt. Davis and Associate Warden McFadden punished Plaintiff for the escape attempt and the assault on the ECI Officer by locking him in a stripped out cell, without bedding, for five months.

In their responsive brief, Defendants explain that on October 11, 2004, Plaintiff was involved in an escape attempt and apprehended along with other inmates.  According to Lt. Davis' Affidavit, Plaintiff was placed in a holding cell and then placed in the SMU.  Because Plaintiff was taken to SMU immediately after his apprehension, he was not given the

---

[18]    *See* Affidavit of Brandon Washington, #284412, attached to [25-2].

[19]    *See* Plaintiff's Motion to Reply to Answer [9-1] at p. 2.

opportunity to bring his possessions with him.[20]  Therefore, a property officer charged with retrieving Plaintiff's belongings from his cell went to Plaintiff's cell and discovered that Plaintiff had destroyed his mattress, leaving only the plastic mattress cover.[21]  Lt. Davis states that mattresses are assigned to inmates and are not left in each cell; therefore, there was no mattress for Plaintiff to use at that time.  According to Lt. Davis' Affidavit, the property officer brought the plastic mattress cover to the SMU.[22]  Because the Plaintiff had destroyed state property, he was asked to pay restitution for the mattress, which he refused.  By Brief, the Defendants explain:  "Because of the scarcity of extra mattresses, as well as the plaintiff's act of destroying his mattress, he was not allowed a replacement temporarily.  However, he was allowed blankets and bedding."[23]  According to Lt. Davis, "[b]ecause [Plaintiff] refused to pay restitution and because mattresses are not in ample supply, he was without a mattress for some period of time until approximately March, 2005."[24]  Lt. Davis' affidavit states that "[b]ecause of the need to control and direct inmates towards positive behavior, it is a general principle that they are not allowed to destroy state supplied belongings and immediately receive replacements."[25]  Lt. Davis does not explain the reason that Plaintiff was not provided with sheets and a blanket until March 16, 2005, more than a week after Plaintiff received a mattress.  Significantly, too, Lt. Davis does not respond to Plaintiff's allegation that Lt. Davis told Plaintiff that Associate Warden Chavis had instructed him not to give Plaintiff a mattress.  Similarly, Lt. Davis does not respond to Plaintiff's claim that Lt. Davis told Plaintiff and

---

[20]     *See* Affidavit of Lt. Willie Davis (hereinafter "Davis Affidavit") [10-4] at ¶ 2.

[21]     *See Id.*  It is not clear to the court how Plaintiff "had destroyed" his mattress.

[22]     *See* Davis Affidavit [10-4] at ¶ 3.

[23]     *See* Defendants' Memorandum [10-2] at p. 2.

[24]     *See* Davis Affidavit [10-4] at ¶ 4.

[25]     *See* Davis Affidavit [10-4] at ¶ 5.

Inmate Washington that they would not get a mattress or other items because they had assaulted an officer.

Lt. Davis admits that Plaintiff was without a mattress from the date he was locked up in SMU (October 11, 2004), until some time in March 2005. Lt. Davis does not explain the reason that Plaintiff did not have sheets or a blanket until March 16, 2005, as Plaintiff alleges.

Plaintiff also claims that he asked Lt. Davis about his property and was told that his property had been stolen. Lt. Davis denies any conversation with Plaintiff regarding his property and claims no knowledge of Plaintiff's claim that he was not allowed to access his property while incarcerated in the SMU.[26] However, as Plaintiff's Exhibit B indicates, Lt. Davis told Plaintiff that he was going to "throw away" Plaintiff's property when Plaintiff was taken to court on February 10, 2005, and Lt. Davis informed an Internal Grievance Committee member that he had allowed Plaintiff entry into his property bag on March 16, 2005.[27] Thus, there is conflicting testimony concerning the handling of Plaintiff's property.

Associate Warden Chavis also has stated by Affidavit that she was assigned to the SMU at ECI at all times pertinent to the Plaintiff's Complaint.[28] She states:

> Each inmate is assigned a mattress which is considered his property during his incarceration. When the property officer went to the Plaintiff's cell to pick up his belongings, she found that both the Plaintiff and his roommate's mattress had been destroyed and only the plastic covering for each inmate's mattress had been left behind."[29] . . . Because of budgetary constraints, there is not always a ready supply of replacement mattresses available to inmates who destroy theirs. Additionally, pursuant to agency policy, reasonable restitution may be collected from an inmate to replay the cost of state property willfully damaged or destroyed by an inmate during this incarceration. The plaintiff refused to pay restitution for his destroyed mattress. For some time, the plaintiff was incarcerated in the [SMU] without a mattress. On or

---

[26]    *See* Davis Affidavit [10-4] at ¶ 6.

[27]    *See* Note 5, *supra.*

[28]    *See* Chavis Affidavit [10-5] at ¶ 1.

[29]    *See* Chavis Affidavit [10-5] at ¶ 4.

about March 8, 2005, the plaintiff was issued another mattress, although he did not pay for it.  I can only assume that a mattress became available and it was issued to the plaintiff.[30]

Thus, Associate Warden Chavis admits that she was aware that Plaintiff was without a mattress for approximately five months.  According to the Affidavit, Associate Warden Chavis believed that Plaintiff had willfully destroyed his mattress, and therefore had to pay restitution to receive another mattress.  However, as Plaintiff has pointed out, an S.C.D.C. form regarding his destruction of his mattress was never submitted to a Shift Supervisor, so the Defendants do not have any evidence to support this claim.[31]  Plaintiff denies having destroyed his mattress.  In his Brief in Opposition to Defendants' Summary Judgment motion, Plaintiff states that his "property and mattress was stolen or thrown away by officers[.]"[32] The court notes that an affidavit from Johnny McCoy, an inmate who was taken to solitary confinement with Plaintiff on October 11, 2004, states that he was told by ECI personnel that their mattresses "were stolen by other prisoners."[33]

Associate Warden Chavis did not respond to Plaintiff's allegation that she had instructed Lt. Davis not to give Plaintiff a mattress.  Furthermore, the "agency policy" to which Associate Warden Chavis refers has not been provided to the court.  In addition, Associate Warden Chavis' statement that spare mattresses are not readily available due to budgetary concerns appears to contradict Lt. Davis' statement to Plaintiff and Inmate Washington to the effect that:  "[I]f y'all want a mattress y'all going to have to pay for one," which implies that a mattress would be immediately available to an inmate who allowed his

---

[30]     *See* Chavis Affidavit [10-5] at ¶ 5.

[31]     *See* Plaintiff's Affidavit at ¶ 11, attached to [21-1].

[32]     *See* Plaintiff's Brief in Opposition to Defendants' Summary Judgment Motion [21-1] at p. 2.

[33]     *See* McCoy Affidavit [24-1]

prison trust account to be debited for the cost. (Inmate McCoy signed the form in which he agreed to pay $45.00 for a mattress, and apparently received a mattress shortly thereafter.[34]).

In summary, it is not clear to the court whether Plaintiff went without a mattress for five months because he refused to pay for a replacement mattress, or whether a replacement mattress was not available to Plaintiff because there were no extra mattresses at ECI due to budgetary concerns, or whether a replacement mattress was available, but Lt. Davis and/or Lt. Chavis decided it would not be given to Plaintiff.

Plaintiff contends that as a result of being housed in the SMU for five months without a mattress, sheets, or a blanket, he suffers chronic back pain and daily headaches, and problems with his nerves.[35] The Defendants have provided the court with an excerpt from Plaintiff's medical records beginning on November 4, 2004 (about three weeks after Plaintiff was placed in SMU), until November 29, 2005 which appear to support Plaintiff's claims of back pain and headaches, at least during that time.[36]

The first medical record provided to the court indicates that Plaintiff was seen on November 5, 2004, complaining of pain in his shoulder from an old gunshot wound, which he told the LPN had "got worse the last few days."[37] Plaintiff apparently also had lower back discomfort and received instructions regarding therapies (rolled towels, exercises) to alleviate his discomfort. He was given acetaminophen.[38]

One week later, on November 12, 2004, Plaintiff again was seen by an LPN for complaints of left shoulder and neck pain that had continued during the previous week. The

---

[34]     *Id.*

[35]     *See* Plaintiff's Brief in Opposition [21-1] at p. 6.

[36]     *See* SCDC Health Services Medical Summary, attached as [10-7]

[37]     *See* SCDC Health Services Medical Summary, attached as [10-7] at p. 6.

[38]     *See* SCDC Health Services Medical Summary, attached as [10-7] at p. 6.

LPN noted tenderness over his left shoulder and mild muscle spasms upon palpitation of the left side of his neck.  He was prescribed Acetaminophen for three days and, if muscle spasms continued, Clorzoxazone for five days.[39]  Plaintiff also complained of lower back discomfort.[40]

On December 23, 2004, Plaintiff again was seen by Sick Call.  He stated:  "My back hurts bad, I have a bullet on the left side".  He again complained of lower back discomfort and was prescribed Acetaminophen, and Clorzoxazone if muscle spasms were present.[41]

On January 13, 2005, Plaintiff was seen in the Doctor's Clinic for complaints of chest pain due to a bullet received in the back of his chest three years earlier.  Dr. Patel prescribed Ibuprofen.[42]

It appears that Plaintiff's next sick call appointment was on May 4, 2005, approximately two months after he received a mattress.  Plaintiff told the LPN "I had got shot in my back in 2001 and I didn't have a mattress for 5 months and now my back be having pains and my left side be going numb."[43]  An appointment with the doctor was made, and on May 25 Plaintiff presented with complaints of back pain, stating that "his whole left side has been going numb [for] 2 [months].  Plaintiff stated his pain was worse in his back.  To rule

---

[39]    Chlorzoxazone is used to relieve pain and stiffness caused by muscle strains and sprains. It is used in combination with physical therapy, analgesics (such as aspirin or acetaminophen), and rest.  *See* www.nlm.nih.gov/medlineplus/druginfor/medmaster/a682577.html, accessed on May 15, 2006.

[40]    *See* SCDC Health Services Medical Summary, attached as [10-7] at p. 6.

[41]    *See* SCDC Health Services Medical Summary, attached as [10-7] at ¶. 4-5.

[42]    *See* SCDC Health Services Medical Summary, attached as [10-7] at p. 4.

[43]    *See* SCDC Health Services Medical Summary, attached as [10-7] at pp. 3-4.

out impingement syndrome, an X-ray of his cervical spine was ordered, and he was given Naproxyn.[44]  The X-ray was taken on June 6, 2005.[45]

On June 29, Plaintiff appeared at Sick Call and stated he "still continue[d] to have problems with his back."  He also complained of headaches.  He stated that the Naproxyn was not effective and he asked to see a physician.[46]  An appointment was made for Plaintiff to see a physician on July 6, but the appointment was rescheduled for July 20, 2005, at which time Plaintiff stated that his continuing complaints of back pain were unrelieved by Naproxyn.  He was prescribed Phenylgesic.[47]

On September 15, 2005, Plaintiff again was seen in Sick Call and stated: "My back is still hurting and I'm still having [headaches]."  Plaintiff stated he had no relief from the prescribed medications.  An appointment with the doctor was made, and on October 13, 2005, he was seen, complaining of back pain and headaches which were somewhat relieved by medicine.  The doctor's assessment was "chronic back pain".  Plaintiff was prescribed Phenylgesic.[48]

## IV.  PROCEDURAL HISTORY

Plaintiff filed this action on September 19, 2005.[49]  [1-1]  The Defendants answered with a general denial, and alleged various defenses including (1) Plaintiff had failed to

---

[44]    *See* SCDC Health Services Medical Summary, attached as [10-7] at p. 3.

[45]    *See* SCDC Health Services Medical Summary, attached as [10-7] at p. 2.  The court cannot locate the results of the X-ray in the Plaintiff's medical records attached to Defendants' Motion.

[46]    *See* SCDC Health Services Medical Summary, attached as [10-7] at p. 2.

[47]    Phenylgesic is a combination of acetaminophen and phenytoloxamine used to treat pain.  *See* www.webmd.com/drugs , accessed on May 15, 2006.

[48]    *See* SCDC Health Services Medical Summary, attached as [10-7] at p. 1.

[49]    Plaintiff has the benefit of the holding of *Houston v. Lack*, 487 U.S. 266 (1988) with respect to the "delivery" date of his initial filing with the court.  *See* Order [4-1] filed on October 3, 2005 at p. 1, n.1.

exhaust his administrative remedies; (2) the Defendants, as officials of the State of South Carolina, were not subject to suit under 42 U.S.C. § 1983; (3) the Defendants were entitled to immunity and qualified immunity; (4) the suit was barred by the South Carolina Tort Claims Act; (5) the suit was barred by the doctrine of sovereign immunity; and (6) the suit was barred by the Prisoner Litigation Reform Act of 1996.  [7-1]

Thereafter, on January 6, 2006, the Defendants filed a Motion for Summary Judgment and a supporting Memorandum.  [10-1; 10-2]  On January 9, the undersigned issued an Order pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), notifying Plaintiff of the dismissal procedure and the possible consequences if he failed to adequately respond to the Motion for Summary Judgment within thirty-four (34) days.  [11-1]  Plaintiff filed a motion requesting an extension of time and a motion for discovery [12-1; 13-2], both of which were granted by the undersigned [15-1], and a motion for appointment of counsel [14-1] which was denied by the undersigned.  [15-1]  On March 2, 2006, Plaintiff filed a response to Defendants' Motion for Summary Judgment.  [21-1]  Accordingly, the case is now ripe for disposition by the undersigned United States Magistrate Judge.

## V.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  However, "[o]nly disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id*. at 248.

## VI.  DISCUSSION

### A.  Whether Plaintiff Exhausted His Administrative Remedies

As a threshold matter, the court must address whether Plaintiff has exhausted the available administrative remedies prior to filing suit. In 1996, as part of the Prison Litigation Reform Act ("PLRA"), Congress made the exhaustion of administrative remedies a mandatory prerequisite for prisoner suits concerning the conditions of confinement brought under Section 1983. *Porter v. Nussle*, 534 U.S. 516, 524 (2002). The PLRA provides in relevant part that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). In *Porter,* the United States Supreme Court held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532. Moreover, "an inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues." *Booth v. Churner*, 532 U.S. 731, 741 n. 6 (2001). An inmate's perception that exhaustion would be futile does not excuse him from the exhaustion requirement. *Id*. "Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." *Porter*, 534 U.S. at 524, *citing Booth*, 532 U.S. at 741. Furthermore, *Porter* makes clear that the provisions in 42 U.S.C. § 1997e(a) applies to state prisoners. *Porter*, 534 U.S. at 524.

Although exhaustion is mandatory, it is not a pleading requirement. *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 677 (4th Cir. 2005). The plaintiff need not allege exhaustion of remedies in his complaint, but, rather, a plaintiff's failure to exhaust administrative remedies under 42 U.S.C. § 1997e(a) is an affirmative defense which the defendants have the burden to plead and prove. *Anderson,* 407 F.3d at 681. In the present case, the Defendants raised Plaintiff's failure to exhaust administrative remedies as an affirmative defense in their Answer and also have argued this as a ground for summary judgment.

However, Plaintiff states in his Complaint [1-1] that he pursued the grievance procedure available at ECI and received a final agency determination on April 4, 2005.[50] The record reflects that Plaintiff's first Inmate Grievance Form, dated March 1, 2005 and identified as ECI-606-05, concerned his missing property. Plaintiff states that he attempted informal resolution of this grievance by writing "request forms" to Lt. Davis but Lt. Davis refused to return his property.[51] Plaintiff asked that his property be returned. However, the Internal Grievance Committee ("IGC") responded with the following statement: "This grievance is being returned unprocessed because you did not attempt an informal resolution, which should have been a Request to Staff to Lt. Davis." Yet, as Plaintiff stated in the Inmate Grievance Form, he <u>had</u> written Requests to Lt. Davis. Furthermore, the IGC stated that Lt. Davis had informed IGC that on March 16, 2005, Plaintiff had been "allowed entry into [his] bag/property. Therefore, your action requested has been accomplished."

Plaintiff filled out a second Inmate Grievance Form, also dated March 1, 2005, identified as ECI-606-06, concerning his missing mattress. Plaintiff states that he had written

---

[50]    Plaintiff is referring to grievance "ECI-825-05" which will be discussed below.

[51]    *See* Exhibit B to Complaint.

Request Forms but did not receive any response to those Forms.[52]  The IGC again responded that the grievance would not be processed and was being returned to Plaintiff because "you did not attempt an informal resolution, which should have been a Request to Staff to Lt. Davis."  As with the first grievance, Plaintiff stated that he <u>had</u> written Requests to Lt. Davis. As another reason for not processing his grievance, however, Plaintiff was informed that Officer Stubbs had told the IGC that Plaintiff had a mattress as of March 17, 2005, so "your action requested has been accomplished."[53]

Plaintiff's third grievance, ECI-825-05, dated March 25, 2005, stated that he did not have a mattress for five months  and sheets and a blanket for several months, and that his requests regarding his property went unanswered.  Plaintiff stated he filed "several Request to the Lt. which he never respond to any of them[.]"[54]  Plaintiff requested compensatory and punitive damages for the injuries he sustained due to those deprivations.  The "Action taken by IGC" stated:  "Your grievance is being returned unprocessed because your action requested does not fall within the remedies within the extent of the SCDC Policy GA-01-12, Inmate Grievance System."[55]

In support of their argument that Plaintiff has failed to exhaust his administrative remedies, Defendants rely upon the Affidavit of Mary Coleman, Chief of the Inmate Grievance Branch of the SCDC.  Ms. Coleman stated that Plaintiff's March 25 grievance was returned unprocessed because Plaintiff had requested only compensatory and punitive damages, which were not available through the SCDC grievance system.  She further explained:

---

[52]     *See* Exhibit C to Complaint.

[53]     *Id.*

[54]     *See* Exhibit E, attached to Complaint.

[55]     *Id.*

Also these two issues had already been addressed in grievance numbers ECI-606-05 and ECI-607-05, and the grievance in question (ECI-825-05) was a duplicate grievance. Prior to this, on March 11, 2005, the institutional grievance coordinator received a grievance concerning the mattress allegation (ECI-607-05). The grievance was returned primarily because the plaintiff had already been issued a mattress and his grievance was moot. Additionally, he had attempted no formal resolution of his grievance. Also, as to the property question, the plaintiff also filed a grievance which was received by the grievance coordinator on March 11, 2005 (ECI-606-05). The coordinator responded by returning the grievance unprocessed because the plaintiff attempted no formal resolution and he had already been allowed access to his property. These grievances noted above were not grieved past the Step 1 level, and therefore, the Plaintiff has not exhausted his available administrative remedies.[56]

The court disagrees with Ms. Coleman's conclusion that Plaintiff has failed to exhaust his administrative remedies. First, it is assumed that Ms. Coleman is mistaken in stating that Plaintiff did not attempt "formal resolution", as Plaintiff was specifically told with respect to the March 1 grievances that they were being returned because he had not attempted "informal resolution." Plaintiff states on the grievance forms that he attempted informal resolution by filing Request Forms, to which he received no response.

Next, the record reflects that Plaintiff's first grievance (regarding his property) was returned as unprocessed because (1) Plaintiff had allegedly failed to pursue an informal resolution (which Plaintiff states he had attempted); and, second, because the action requested had been accomplished. Plaintiff's second grievance likewise was returned for the same reasons. With respect to these grievances, several questions arise:. First, Plaintiff claims that he pursued informal resolution of those grievances, while the Defendants state he failed to do so. Second, because each grievance was returned as "unprocessed", despite Plaintiff's statement that he had attempted an informal resolution with Lt. Davis, this begs the question whether these grievances were properly handled by ECI so to enable Plaintiff to exhaust his administrative remedies. Third, the court is uncertain as to the relationship between an "unprocessed" grievance and the exhaustion process, as it is unclear whether an unprocessed

---

[56]    *See* Coleman Affidavit [10-6] at ¶ 6.

grievance can be pursued.  Finally, both grievance forms state that Plaintiff's requested action has been accomplished, which would suggest that an inmate would not appeal the action taken by the IGC and thus pursue his administrative remedies.

To the extent that Plaintiff exhausted the administrative remedies "available" to him, as required by the PLRA, the court must look to those remedies that actually are "available" to him.  "To be 'available' under the PLRA, a remedy must afford 'the possibility of some relief for the action complained of.'"  *Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir. 2004), *citing Booth v. Churner*, 532 U.S. 731, 738 (2001).  As *Abney* holds, "[t]he PLRA requirement that inmates exhaust 'such administrative remedies as are available,' 42 U.S.C. § 1997e(a), 'refer[s] to the procedural means, not the particular relief ordered,' since 'one 'exhausts' processes, not forms of relief.'"  *Abney*, 380 F.3d at 667, *citing Booth*, 532 U.S. at 739; *accord Porter*, 534 U.S. at 524 ("Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit.").  The Supreme Court, in *Booth*, noted that "[w]ithout the possibility of some relief, the administrative officers would presumably have no authority to act on the subject of the complaint, leaving the inmate with nothing to exhaust."  *Booth*, 532 U.S. at 736 n. 4. Plaintiff's first two grievances were "unprocessed" and returned to him, which appears to the court to leave Plaintiff with "nothing to exhaust" under *Booth.*

Ms. Coleman sets forth a litany of reasons that Plaintiff failed to exhaust his March 25 grievance.  She states that because money damages are not available through the SCDC grievance system, the grievance was returned unprocessed.[57]  However, as *Porter* teaches, "[e]ven when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit."  *Porter*, 534 U.S. at 524.  Exhaustion of the administrative grievance procedure is mandatory under Section 1997(e)(a), regardless of the

---

[57]     *See* Coleman Affidavit [10-6] at ¶ 6.

remedy sought (in this case, compensatory and punitive damages), so it follows that ECI was obligated to process the grievance, even though Plaintiff requested money damages. *See Porter*; *see also Booth v. Churner*, 532 U.S. 731, 734, 739 (2001) (requiring exhaustion of Eighth Amendment claim for money damages despite the fact that money damages were not available under the state's administrative grievance scheme).

As mentioned above, the exhaustion requirement is an affirmative defense which the defendants have the burden to plead and prove. *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 681 (4th Cir. 2005). However, the "[d]efendants may . . . . be estopped from raising non-exhaustion as an affirmative defense when prison officials inhibit an inmate's ability to utilize grievance procedures." *Fair v. Hallman*, 2006 WL 1172198 at *5 (D.S.C. May 2, 2006) (Seymour, J.), *quoting Stenhouse v. Hughes*, 2006 WL 752876 at *2 (D.S.C. March 21, 2006), *citing Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir. 2004). As Judge Herlong noted in *Stenhouse,* "[a]dditionally, exhaustion may be achieved in situations where prison officials fail to timely advance the inmate's grievance or otherwise prevent him from seeking his administrative remedies." *Stenhouse,* 2006 WL 752876 at *2, *citing Abney* 380 F.3d at 667. In this case, the ECI prison officials appear to have inhibited or blocked Plaintiff's ability to utilize grievance procedures by returning his grievances unprocessed. As a result, under the reasoning set forth in *Abney,* and cited with approval by *Stenhouse,* it appears that Plaintiff essentially achieved the exhaustion of administrative remedies.

On the other hand, even if this court were to find that Plaintiff did not exhaust his administrative remedies, the court nonetheless finds that "special circumstances" have been plausibly alleged by the Plaintiff to justify Plaintiff's failure to comply with the ECI administrative procedural requirements. For example, in *Brownell v. Krom,* — F.3d —, 2006 WL 1174080 (2d Cir. May 3, 2006), the Second Circuit addressed the issue of whether a grievance, not sufficient on its face to exhaust administrative remedies as to Section 1983

claims, nevertheless could be reviewed by a court because "special circumstances" existed to justify the prisoner's failure to comply with administrative procedural requirements. In *Brownell*, the Second Circuit held that the prison officials' erroneous interpretation of administrative regulations constituted "special circumstances" which justified that inmate's failure to comply with administrative procedural requirements. *Brownell*, — F.3d at —, 2006 WL 1174080 at *6. *Brownell* relied upon the three part test articulated in *Hemphill v. State of New York*, 380 F.3d 680 (2d Cir. 2004), which was "appropriate in cases where a prisoner plaintiff plausibly seeks to counter defendants' contention that the prisoner has failed to exhaust available administrative remedies as required by the PLRA." *Hemphill*, 380 F.3d at 686. Pursuant to *Hemphill*, the court must ask, first:

> whether administrative remedies were in fact "available" to the prisoner. [Second], [t]he court should also inquire . . . whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. [Third], [i]f the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements. *Id.* (emphasis added; internal citations omitted).

Applying the three *Hemphill* factors to the case at bar, the court concludes, first, that administrative remedies were available to Plaintiff. In the present case, it appears to the court the ECI personnel, by returning two of Plaintiff's grievances to him as "unprocessed" and stating that the actions he requested had been accomplished (suggesting that there was no need to appeal the IGC's return of his grievances), and returning the third grievance as unprocessed because the IGC believed Plaintiff could not grieve a complaint which sought money damages (contrary to the PLRA), all constitute actions which "inhibit [the] inmate's ability to utilize grievance procedures." *Stenhouse v. Hughes*. And, even if this court were to find that Plaintiff failed to exhaust his administrative remedies, the court believes that there exist special circumstances in this case which would justify Plaintiff's failure to comply with

the grievance process, because the return of Plaintiff's grievances as "unprocessed" left him without any ability to exhaust his administrative remedies. It appears that the Plaintiff was thwarted in his efforts to exhaust his administrative remedies with regard to both of the March 1 grievances, and the March 25 grievance. Thus, the Defendants should not be permitted to raise failure to exhaust as an affirmative defense to this action.

## B. The Eighth Amendment

The Eighth Amendment prohibits the infliction of "cruel and unusual punishment," U.S. Const. amend. VIII, and applies to states through the Due Process Clause of the Fourteenth Amendment. *See Robinson v. California*, 370 U.S. 660, 666-67 (1962). "It not only out-laws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996); *see Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Eighth Amendment imposes certain duties upon prison officials to ensure that inmates receive adequate food, clothing, shelter and medical care, and must "take reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "Conditions within the prison may constitute cruel and unusual punishment in violation of the Eighth Amendment if they result in 'unquestioned and serious deprivation of basic human needs.'" *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Only those conditions depriving inmates of "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation. *Id*.

The Supreme Court has applied the Eighth Amendment in prison cases of two types – those that address "conditions of confinement" and those that address "excessive force".[58]

---

[58]    *See* United States Supreme Court Brief of Respondent's in *Overton v. Bazzetta*, 2003 WL 469673 at *43-44.

The "conditions of confinement" cases assessed various acts or omissions by prison officials in the routine administration of their facilities that caused prisoners to suffer harm. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Hutto v. Finney*, 437 U.S. 678 (1978); *Rhodes v. Chapman*, 452 U.S. 337 (1981); *Wilson v. Seiter*, 501 U.S. 294 (1991); *Helling v. McKinney*, 509 U.S. 25 (1993); *Farmer v. Brennan*, 511 U.S. 825 (1994). Routine discomfort is part of the penalty that convicted prisoners pay for having committed crimes. *Rhodes v. Chapman*, 452 U.S. at 347. Consequently, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

The "excessive force" cases assessed the application of physical force when controlling prisoner behavior. *Whitley v. Albers*, 475 U.S. 312 (1986); *Hudson v. McMillian*, 503 U.S. 1 (1992). Both lines of cases require, to different degrees, the satisfaction of both an objective and subjective component for establishing an Eighth Amendment violation. To prove a violation of the Eighth Amendment, an inmate must show: (1) objectively, that the deprivation alleged is "objectively sufficiently serious" such that the plaintiff was denied "the minimal civilized measure of life's necessities;" and (2) subjectively, that the defendant officials possessed a "sufficiently culpable state of mind" associated with "the unnecessary and wanton infliction of pain." *Farmer v. Brennan*, 511 U.S. at 834.

In order to state a claim of constitutional significance regarding prison conditions, a plaintiff must demonstrate not only that the living conditions violated contemporary standards of decency, but also that prison officials acted with deliberate indifference to such conditions. *Wilson v. Seiter*, 501 U.S. 294 (1991).

Objectively, then, a plaintiff must allege facts sufficient to show either that he has sustained a serious or significant mental or physical injury as a result of the challenged conditions or that the conditions have created an unreasonable risk of serious damage to his future health. *Strickler v. Waters*, 989 F.2d 1375, 1380-1381 (4th Cir. 1993); *Helling v.*

*McKinney*, 509 U.S. 25 (1993). With regard to the objective component, that the alleged deprivation be "objectively sufficiently serious," a court must consider whether the correctional officers' actions, taken contextually, were objectively harmful enough to offend contemporary standards of decency. *See Hudson v. McMillian*, 503 U.S. 1, 6 (1993). A condition of harm is sufficiently serious if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society . . . or which involve the unnecessary or wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). With respect to showing whether prison conditions objectively pose a significant risk of serious harm, *Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991) states:

> some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise-for example, a low cell temperature at night combined with a failure to issue blankets.

Next, the subjective element is satisfied by demonstrating that defendants acted with deliberate indifference toward the deprivation. A prison "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir.1997), *citing Farmer,* 511 U.S. at 837. In *Farmer*, the Supreme Court held that the question was whether a prison official knew of and disregarded an excessive risk to an inmates's health or safety. *Farmer*, 511 U.S. at 837. The Court added that "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of harm." *Id*. at 842. The subjective element test was discussed in *Whitley v. Albers*, 475 U.S. 312 (1986), a case where an inmate, shot by a guard during an attempt to quell a prison disturbance, contended that he had been subjected to cruel and unusual punishment. The Court in *Whitley* held:

> After incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment. To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety . . . . It is *obduracy and*

*wantonness, not inadvertence or error in good faith*, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.[59]

These cases mandate inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment.[60]

Thus, with respect to the subjective part of the test, the undersigned must review the record to determine whether the Defendants knew that their conduct involved more than a lack of due care, and that their actions were taken with "obduracy and wantonness, not inadvertence or error in good faith". In summary, then, the Plaintiff must make two showings in order to state a viable Eighth Amendment claim. The first showing requires the court to determine whether the deprivation of a basic human need was objectively "sufficiently serious", while the second requires it to determine whether the officials subjectively acted with a "sufficiently culpable state of mind." *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir.), *cert. denied*, 510 U.S. 949, 1 (1993), *quoting Wilson*, 501 U.S. at 298.

Plaintiff's claims will be examined under this paradigm of analysis. Objectively, the record reflects that at this juncture, Plaintiff has shown sufficient evidence of physical injury to state a claim against Defendants for a violation of the Eighth Amendment. Plaintiff was housed in a cell for five months and slept on a steel bed without a mattress, sheets, or a blanket. As a result, Plaintiff has alleged that he was "having back pains and bad headaches while I was sleeping in that cell and after, and taking medication . . . and I didn't have any of these problems until I had to sleep on that cold steel. Medical stated that the pain probably will never go away."[61] Even after Plaintiff received a mattress and bedding, his pain

---

[59]     *Wilson*, 501 U.S. at 298-99; *quoting Whitley*, 501 U.S. at 319 (emphasis added in the original, and citations and internal quotation marks omitted).

[60]     *Wilson v. Seiter*, 501 U.S. at 299 (footnote and internal citation omitted).

[61]     *See* Plaintiff's Complaint [1-1] at p. 5.

continued.  Thus, Plaintiff has presented evidence which strongly suggests that because he was deprived of a mattress for five months, he sustained injuries that caused him pain, and that may continue in the future.  This court finds no difficulty in determining that objectively, Plaintiff's incarceration for five months without a mattress, sheets, or a blanket constitutes a deprivation of a basic human need that is objectively "sufficiently serious" to implicate the Eighth Amendment.  Indeed, in *Matherly v. Smith*, 813 F.2d 402 (Table) (4th Cir. 1986) (*per curiam*) Judges Sprouse, Ervin and Chapman observed, with respect to a pre-trial detainee, "[a]lthough we express no view on the merits, we believe Matherly's allegation that he was confined in an isolation cell with no clothing or bedding for two days states a claim of unconstitutional conditions in violation of the due process clause."  *Matherly, citing Bell v. Wolfish*, 441 U.S. 520 (1979); *see also Johnson v. Williams*, 788 F.2d 1319 (8th Cir. 1986) (eighth amendment violation found where prisoner in quiet cell for 18 hours on two occasions with no clothing or bedding); *and McGray v. Burrell*, 516 F.2d 357 (4th Cir. 1975), *cert. dismissed*, 426 U.S. 471 (1976) (eighth amendment violation where prisoner in isolation cell for 48 hours for mental observation with no clothing or bedding).  Likewise, in *O'Connor v. Keller*, 510 F.Supp. 1359, 1372, 1375 (D.Md. 1981), the court found an eighth amendment violation where a prisoner was kept in an isolation cell for 48 hours without a mattress, blanket, toilet paper, or, for part of the time, clothing.  The court concludes that Plaintiff has shown that, objectively, the Defendants violated his rights under the Eighth Amendment.

With respect to the subjective prong of this test, it is clear that once the responsible prison official becomes aware that conditions at his facility are depriving inmates of one or more basic human needs, that official must take corrective action.  *Brown v. Mitchell*, 327 F.Supp.2d 615, 650 (E.D. Va. 2004); *Wilson*, 501 U.S. at 300; *Strickler*, 989 F.2d at 1382; *Williams v. Griffin,* 952 F.2d 820, 826 (4th Cir. 1991).  Not to take corrective action would show, with respect to the subjective element of an Eighth Amendment analysis, that

Defendants were deliberately indifferent to Plaintiff's needs. It appears to the court that Plaintiff has forecast enough evidence to show that the Defendants were deliberately indifferent:

> Defendants did know of the conditions I was living under, and they let it go on in order to cause discomfort and pain, which is deliberate indifference. Objective evidence is factual evidence that I was deprived of basic human needs. Subjective evidence is evidence that the prison official knew I was being deprived and did not respond reasonably. As stated in the complaint I did reasonably inform[] Defendants of my conditions. Both defendants knew, one work[ed] in SMU as the Lt., the other was the A.W. over SMU. Lt. Davis informed me that the reason he was depriving me was because he was informed by A.W. Chavis to do so, and the reason of doing so was to get back at me for my actions that cause me to be in SMU. And they did cause pain and injury, which I am presently taking medication for. First, they made me stand in a cell for over six hours, then I was forced to live in a stripped out cell for five months all during the winter season all without proper working heat. All this could be proven at trial[.][62]

In *Williams v. Griffin*, 952 F.2d 820 (4th Cir. 1991), the court, following the teachings of *Wilson v. Seiter*, noted that while the words "cruel and unusual punishment" require a state-of-mind showing of deliberateness, "[t]he long duration of a cruel prison condition may make it easier to establish knowledge and hence some form of intent[.]" *Williams*, 952 F.2d at 826, *citing Wilson.* As the court admonished in *Williams*, "once prison officials become aware of a problem with prison conditions, they cannot simply ignore the problem, but should take corrective action." *In Williams*, the court noted that ""summary judgment is seldom appropriate in cases wherein particular states of mind are decisive as elements of [a] claim or defense."" *Williams*, 952 F.2d at 826, *quoting Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985) (citations omitted). Indeed, in *Brice v. Virginia Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995),[63] the court held that "[a]ctual knowledge or awareness on the part of the alleged inflicter thus becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have

---

[62]    *See* Plaintiff's Motion [9-1] at p. 3.

[63]    The opinion was written by Senior Judge Phillips and was joined by Judge Russell and Judge Luttig.

inflicted punishment.'" *Farmer*. It therefore "remains open to officials to prove that they were unaware of even an obvious risk to inmate health or safety." *Brice, quoting Farmer*. Nonetheless, even under this subjective standard, a prison official cannot hide behind an excuse that he was unaware of a risk, no matter how obvious. As the Court explained,

> Whether a prison official had the requisite knowledge of a substantial risk [is] a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that a risk was obvious."

In the present case, Lt. Davis refused to give Plaintiff a mattress for approximately five (5) months. According to Plaintiff, Lt Davis was punishing Plaintiff for assaulting an officer, in connection with the attempted escape, and also was acting pursuant to instructions from A.W. Chavis. The Defendants do not dispute that Plaintiff was involved in an escape attempt which resulted in his incarceration in the SMU. As in *Williams*, Plaintiff's allegations, considered in a light most favorable to him, provides sufficient evidence from which the inference of deliberate indifference could be drawn. Thus, the court finds that Plaintiff has produced sufficient evidence on each element of his section 1983 prison conditions case to withstand Defendants' motion for summary judgment.

### Inapplicability of the defense of qualified immunity

As discussed above, to prevail on an Eighth Amendment claim alleging cruel and unusual punishment, the Plaintiff must show that Defendants acted with "deliberate indifference" and that the deprivation to which he was subjected was so serious that he was denied "the minimal civilized measure of life's necessities." *Wilson v. Seiter*, 501 U.S. at 297-98. The court concludes that Plaintiff has set forth triable issues of fact as to whether Defendants violated his rights under the Eighth Amendment.

Although Defendants argue they should be granted summary judgment because they are protected by the doctrine of qualified immunity, the court is not persuaded, on this record,

that this is a viable defense to Defendants' actions.  It is true that government officials performing discretionary functions generally are shielded from liability for civil damages <u>insofar as their conduct does not violate clearly established statutory or constitutional rights</u> <u>of which a reasonable person would have known</u>.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (emphasis supplied by the undersigned).  In determining whether a governmental officer is immune from suit based on the doctrine of qualified immunity, the court must answer two questions.  The first is, taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Although a negative answer would end this court's analysis because qualified immunity would protect the defendants from liability, the undersigned does not believe, under the facts as alleged, that this question can be answered in the negative.  Thus, if a constitutional violation has occurred, the court must further inquire "whether the right was clearly established."  *Id*.  "If the law did not put the [defendant] on notice that [his] conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  *Saucier*, 533 U.S. at 202.  The reasonableness of a defendant's conduct is judged "against the backdrop of the law at the time of the conduct."  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam).  In *Brosseau*, the Supreme Court emphasized that "the qualified immunity inquiry must be undertaken in light of the specific context of the case."  *Id*.  In that case, the defendant police officer had shot a fleeing felon in the back.  *Id*. at 596-97.  The Supreme Court found that case law clearly established that in a case involving excessive force "where the officer has probable cause to believe that the suspect poses a threat of serious physical harm," the outcome depends very much on the specific facts of each case. *Id*. at 589, 591.  Therefore, the Supreme Court held that because the officer's actions fell "in the 'hazy border between excessive and acceptable force," ' the officer was entitled to qualified immunity.  *Id*. at 591 (internal citation omitted).

In the present case, the court does not find that such a "hazy border" exists.  Instead, it finds there are triable issues of fact as to whether the conduct of Lt. Davis and Assistant Warden Chavis violated the Plaintiff's Eighth Amendment rights.  As alleged by Plaintiff, the only reason that he was denied a mattress, sheets, and a blanket for five months during the winter was because the Defendants wished to punish him for engaging in an escape attempt and assaulting an officer.

Given the above discussion, the court finds that the additional defenses set forth by the Defendants, *to wit,* that the Defendants, as officials of the State of South Carolina, were not subject to suit under 42 U.S.C. § 1983; that the Defendants were entitled to immunity; that the suit was barred by the South Carolina Tort Claims Act; and that the suit was barred by the doctrine of sovereign immunity, do not merit discussion.

## <u>RECOMMENDATION</u>

Based upon the foregoing, it is recommended that the Defendants' Motion for Summary Judgment **[10-1] should be denied,** and this matter be set for a trial on the merits.

S/George C. Kosko
United States Magistrate Judge

May 17, 2006

Charleston, South Carolina

**Notice of Right to File Objections to Magistrate Judge's "Report and Recommendation"**
**& The Serious Consequences of a Failure to Do So**

The parties are hereby notified that any objections to the attached Report and
Recommendation (or Order and Recommendation) must be filed within **ten (10) days** of its
service.  28 U.S.C. § 636 and Fed. R. Civ. P. 72(b).  The time calculation of this ten-day
period excludes weekends and holidays and provides for an additional three days for filing by
mail.  Fed. R. Civ. P. 6.  Based thereon, this Report and Recommendation, any objections
thereto, and the case file will be **delivered to a United States District Judge** fourteen (14)
days after this Report and Recommendation is filed.  Advance Coating Technology, Inc. v.
LEP Chemical, Ltd., 142 F.R.D. 91, 94 & n. 3, (S.D.N.Y. 1992).  A magistrate judge makes
only a recommendation, and the authority to make a final determination in this case rests with
the United States District Judge.  *See* Mathews v. Weber, 423 U.S. 261, 270-271 (1976); and
Estrada v. Witkowski, 816 F. Supp. 408, 410 (D.S.C. 1993).

During the period for filing objections, but not thereafter, a party must file with the
Clerk of Court specific, written objections to the Report and Recommendation, if he or she
wishes the United States District Judge to consider any objections.  **Any written objections
must *specifically identify* the portions of the Report and Recommendation to which
objections are made *and* the basis for such objections.**  *See* Keeler v. Pea, 782 F. Supp. 42,
43-44 (D.S.C. 1992); and Oliverson v. West Valley City, 875 F. Supp. 1465, 1467, (D.Utah
1995).  Failure to file specific, written objections shall constitute a waiver of a party's right to
further judicial review, including appellate review, if the recommendation is accepted by the
United States District Judge.  *See* United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir.)
1984, *cert. denied*, Schronce v. United States, 467 U.S. 1208 (1984); and Wright v. Collins,
766 F.2d 841, 845-847 & nn. 1-3 (4th Cir. 1985).  Moreover, if a party files specific
objections to a portion of a magistrate judge's Report and Recommendation, but does not file
specific objections to other portions of the Report and Recommendation, that party waives
appellate review of the portions of the magistrate judge's Report and Recommendation to
which he or she did not object.  In other words, a party's failure to object to one issue in a
magistrate judge's Report and Recommendation precludes that party from subsequently
raising that issue on appeal, even if objections are filed on other issues.  Howard v. Secretary

of HHS, 932 F.2d 505, 508-509 (6th Cir. 1991).  *See also* Praylow v. Martin, 761 F.2d 179, 180 n. 1 (4th Cir. 1985)(party precluded from raising on appeal factual issue to which it did not object in the district court), *cert. denied*, 474 U.S. 1009 (1985).  In Howard, supra, the Court stated that general, non-specific objections are *not* sufficient:

**A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object.  The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless.  * * *  This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act.  * * *   We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.**

*Accord* Lockert v. Faulkner, 843 F.2d 1015, 1017-1019 (7th Cir. 1988), where the Court held that the appellant, who proceeded *pro se* in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

**Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review.  * * * A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.**

*See also* Branch v. Martin, 886 F.2d 1043, 1046 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a *pro se* litigant; and Goney v. Clark, 749 F.2d 5, 7 n. 1 (3rd Cir. 1984)("plaintiff's objections lacked the specificity to trigger *de novo* review").

        This notice, hereby, apprises the parties of the consequences of a failure to file specific, written objections.  *See* Wright v. Collins, supra; and Small v. Secretary of HHS, 892 F.2d 15, 16 (2nd Cir. 1989).  Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections addressed as follows:

**Larry W. Propes, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402**